## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF NEW JERSEY, *ex rel.* [UNDER SEAL] | Civil Action No.: _____ |
| Plaintiffs, | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730** |
| v. | **DO NOT PUT ON PACER** |
| [UNDER SEAL], | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Robert A. Magnanini
Kenneth S. Levine
Julio C. Gomez
STONE & MAGNANINI LLP
400 Connell Drive, Suite 6200
Berkeley Heights, New Jersey 07922
Tel:    (973) 218-1111
Fax:    (973) 218-1106
rmagnanini@smcomplex.com
klevine@smcomplex.com
jgomez@smcomplex.com

*Attorneys for Relator Perry Iasiello*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF NEW JERSEY, *ex rel.* PERRY IASIELLO,<br><br>Plaintiffs,<br><br>v.<br><br>SUMMIT OAKS HOSPITAL, INC.; HAMPTON HOSPITAL d/b/a HAMPTON BEHAVIORAL HEALTH CENTER; UNIVERSAL HEALTH SERVICES, INC.; and UHS OF DELAWARE, INC.,<br><br>Defendants. | **Civil Action No. _____**<br><br>**COMPLAINT**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**<br><br>**JURY TRIAL DEMANDED** |

On behalf of the United States of America and the State of New Jersey, Plaintiff-Relator Perry Iasiello ("Relator"), by and through the undersigned counsel, files this *qui tam* Complaint against Defendants (i) Summit Oaks Hospital, Inc. ("Defendant Summit Oaks"); (ii) Hampton Hospital, d/b/a Hampton Behavioral Health Center ("Defendant Hampton Hospital"); (iii) Universal Health Services, Inc., ("Defendant UHS, Inc."); and (iv) UHS of Delaware, Inc. ("Defendant UHS Delaware," and together with Defendant UHS, Inc., "Defendant UHS") (collectively, "Defendants"), under the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the

1

"FCA") and the New Jersey False Claims Act, N.J.S.A. §§ 2A:32C-1 *et seq.* (the "NJFCA"). Relator also files this action for damages arising from Defendants' wrongful constructive discharge against Relator in violation of the anti-retaliation provisions of 31 U.S.C. § 3730(h), N.J.S.A. § 2A:32C-10, and N.J.S.A. § 34:19-1 *et seq.* In furtherance of these claims, Relator alleges as follows:

## I.    **INTRODUCTION**

1.    Relator was the Chief Executive Officer of Defendant Summit Oaks, a behavioral health hospital located in Summit, New Jersey, from March 2024 until his forced resignation and constructive discharge in July 2025. Defendant UHS owned and controlled Defendant Summit Oaks as well as Defendant Hampton Hospital, a sister behavioral health hospital to Defendant Summit Oaks, located in Westhampton, New Jersey.

2.    During Relator's time leading Defendant Summit Oaks, Relator learned about, and attempted to shut down, two separate largescale Medicaid and Medicare billing frauds perpetrated by the Defendants on the Federal Government and State of New Jersey.

3.    *First,* from at least 2019 to present, Defendant Summit Oaks—with the full knowledge, and at the direction, of Defendant UHS—falsely billed and received about $60 million in reimbursements from government programs for *residential rehabilitation services* Defendant Summit Oaks did not perform.

4.    In fact, Defendant Summit Oaks was never licensed, authorized, or otherwise able to perform those residential rehabilitation services, and did not perform the services it claimed to have performed in its reimbursement submissions. Instead, Defendant Summit Oaks was only authorized to perform *inpatient withdrawal management services,* a higher level of care that was

2

less common, less popular, and a service Defendant Summit Oaks was not providing to these patients.

5.     In short, patients did not receive the residential rehabilitation services they were promised, and which the Federal Government and State of New Jersey paid for.  The thousands of reimbursement claims Defendant Summit Oaks submitted to the Federal Government and State of New Jersey for these residential rehabilitation services, in exchange for tens of millions of dollars in payment, were materially false.

6.     *Second*, from at least 2019 to present, Defendant Summit Oaks and Defendant Hampton Hospital—again with the full knowledge, and at the direction, of Defendant UHS— falsely submitted about $10 million in reimbursement claims to government programs for outpatient mental health or substance abuse treatment for *"Intensive Outpatient Program," or "IOP"* services.

7.     But, as with the residential rehabilitation services fraud, neither Defendant Summit Oaks nor Defendant Hampton Hospital was ever licensed or otherwise authorized to provide, or receive government-funded reimbursement for, these IOP services.  Instead, Defendant Summit Oaks and Defendant Hampton Hospital were only licensed and authorized to perform a higher level of service, called *"Partial Hospitalization Programs," or "PHPs."*

8.     Defendant Summit Oaks and Defendant Hampton Hospital therefore upcoded their reimbursement claims submitted to the Federal Government and State of Jersey, claiming they were performing the higher level PHP services that they were not actually performing.

9.     In both cases, the Defendants engaged in the fraud for simple economic reasons: more patients needed the lower level services that Defendants were not licensed or equipped to provide, and Defendants could not have filled the beds at Defendant Summit Oaks and Defendant

3

Hampton if they had only provided the higher-level services that they were licensed and authorized to provide. Yet Defendants still told patients they were providing those services, and still falsely billed the Federal Government and State of New Jersey for those services.

10. Relator sought to put an end to the false billing practices at Defendant Summit Oaks, and met significant resistance for his efforts.

11. Relator was also required every year, as part of his role as CEO of Defendant Summit Oaks, to sign a certification of compliance with material laws and regulations. By July 2025, when the next certification was due, Relator could not accurately sign that certification, because Defendant UHS had not taken steps that Relator had identified to bring Defendant Summit Oaks into compliance. Defendant UHS also had not changed its requirements to have Relator sign the certification. Therefore, Relator was compelled to resign, a constructive discharge from his position.

12. Relator brings this action to recover: (a) damages and civil penalties on behalf of the Federal Government and the State of New Jersey arising from Defendants' submission of false and/or fraudulent records, statements, and claims made and caused by Defendants and/or their agents and employees, in violation of the FCA and NJFCA; and (b) damages arising from the wrongful constructive discharge by Defendants Summit Oaks and UHS against Relator in violation of the anti-retaliation provisions of the FCA, NJFCA, and the New Jersey Conscientious Employee Protection Act ("CEPA").

## II. PARTIES

13. **Relator Perry Iasiello** ("Relator") is a citizen of the United States and a resident of the State of New Jersey.

4

14.    **Defendant Summit Oaks Hospital, Inc.** ("Defendant Summit Oaks") is a domestic corporation duly existing by the virtue and laws of the State of New Jersey. Defendant Summit Oaks owns and operates a behavioral health facility located at 19 Prospect Street, Summit, New Jersey 07901.

15.    The New Jersey Department of Health ("NJDOH") has licensed Defendant Summit Oaks for 84 beds for "adult intermediate specialized psych.," 22 beds for "child/adolescent intermediate psych.," and 20 beds for "inpatient alcohol."

16.    **Defendant Hampton Hospital**, d/b/a Hampton Behavioral Health Center ("Defendant Hampton Hospital") owns and operates Hampton Behavioral Health Center, a mental health care facility, located at 650 Rancocas Road, Westhampton, New Jersey 08060.

17.    The NJDOH has licensed Defendant Hampton Hospital for 105 beds for "adult acute open psych.," and 15 beds for "child/adolescent acute psych."

18.    **Defendant Universal Health Services, Inc.** ("Defendant UHS, Inc.") is a publicly traded multi-national healthcare company that was formed in Delaware in 1979 and is headquartered in King of Prussia, Pennsylvania. Defendant UHS, Inc. is one the country's largest owner and operator of private, for-profit hospitals, and owns more than 300 psychiatric and behavioral health facilities worldwide, admitting hundreds of thousands of patients per year and generating annual revenue in excess of $14 billion. Defendant UHS, Inc. has more than 96,000 employees and provides services in 39 states, the District of Columbia, Puerto Rico, and the United Kingdom. Defendant UHS, Inc. owns, operates, manages, and controls behavioral and psychiatric health facilities across the United States, including New Jersey.

19.    **Defendant UHS of Delaware, Inc.** ("UHS Delaware") is a corporation formed under the laws of the State of Delaware with its principal place of business in the Commonwealth

5

of Pennsylvania. Defendant UHS Delaware is the management and administrative services company for Defendant UHS, Inc. and is wholly owned by Defendant UHS, Inc. Defendant UHS Delaware is responsible for administration and management of behavioral and psychiatric health facilities throughout the United States, including the Psychiatric Institute of Washington, in Washington, D.C.

20.    Defendants UHS, Inc. and UHS Delaware refer to themselves collectively as "UHS" and for the purposes of this Complaint are collectively referred to herein as "Defendant UHS."

21.    At all relevant times, Defendant UHS owned, operated, managed, maintained and/or controlled both Defendant Summit Oaks and Defendant Hampton Hospital.

### III.    JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over Relator's FCA and NJFCA claims.

23.    The United States District Courts have exclusive jurisdiction over actions brought under the FCA pursuant to 31 U.S.C. § 3732, and otherwise have jurisdiction over federal statutory causes of action under 28 U.S.C. § 1331 and 1345.

24.    This Court has personal jurisdiction over each Defendant pursuant to 31 U.S.C. § 3732(a) because the False Claims Act authorizes nationwide service of process and Defendant has sufficient minimum contacts with the United States of America.

25.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and 1391(c), because each Defendant transacts business in this District.

26.    Each Defendant is subject to the general and specific jurisdiction of this Court.

27.    Under the FCA, this Complaint is to be *filed in camera* and remain under seal for at least 60 days unless the Court orders otherwise. In accordance with 31 U.S.C. § 3730(b)(2),

6

this complaint has been filed in camera and will remain under seal for a period of at least 60 days and shall not be served on the Defendants until the court so orders.

28.     Any and all acts alleged here to have been committed by each of the Defendants were committed by said Defendant's officers, directors, employees, representatives, or agents who at all times acted on behalf of the Defendant and within the course and scope of their employment.

29.     No allegation set forth in this Complaint is based upon prior public disclosures (31 U.S.C. § 3730(e)(4)(A)) of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

30.     To the extent there has been a public disclosure, Relator is the original source of those allegations within the meaning of the False Claims Act. 31. U.S.C. § 3730(e)(4)(B).

31.     Relator personally witnessed and gained direct and independent knowledge of the information on which the below allegations are based, and has voluntarily disclosed such information to the United States before filing as required by 31 U.S.C. § 3730(e)(4)(B)(i).

## IV.    RELEVANT STATUTORY AND REGULATORY FRAMEWORK

## A.    GOVERNMENT-FUNDED HEALTH PROGRAMS

### 1.    Medicaid Program

32.     The Medicaid Program was created in 1965 when Congress enacted Title XIX of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicaid") to expand the nation's medical assistance program to cover the financially needy, aged, blind, or disabled, and families with dependent children. *See* 42 U.S.C. §§ 1396-96w; *see also* N.J.S.A. § 30:4D-1, *et seq.* (together, "Medicaid"). Medicaid is funded by both federal and state governments (collectively, "Medicaid Funds"), with the federal contribution computed separately for each state. 42 U.S.C. §§ 1396b,

1396d(b). Medicaid was designed to assist participating states in providing medical services, durable medical equipment, prescription drugs, and non-emergency medical transportation services to financially-needy individuals who qualify under its terms and conditions. At the federal level, Medicaid is administered by CMS. At the state level, each of the 50 participating states has a state agency to administer the program.

33. Each state is permitted to design its own medical assistance plan, subject to CMS parameters and HHS approval.

34. The federal statute defers to each state's definition of "medical necessity" for purposes of Medicaid. In New Jersey, "medical necessity" is clearly a prerequisite for provision of Medicaid services, but is a determination left to the physician's discretion: "Any service limitations imposed will be consistent with the medical necessity of the patient's condition as determined by the attending physician or other practitioner and in accordance with standards generally recognized by health professionals and promulgated through the New Jersey Medicaid program." N.J.A.C. § 10:49-5.1 (2016).

### 2. New Jersey Administration of Medicaid for Behavioral Health Services in the State

35. The Division of Medical Assistance and Health Services, within the New Jersey Department of Human Services ("DMAHS"), administers New Jersey's Medicaid program.

36. The New Jersey Medicaid program provides intensive in-community mental health rehabilitation and behavioral assistance services to improve or stabilize residents.

37. These services are provided within the context of an approved plan of care and are restorative or preventative in nature.

38. Pursuant to N.J.A.C. § 10:49-9.8(a), "providers shall certify that the information furnished on the claim is true, accurate, and complete."

8

39.     Further, pursuant to N.J.A.C. § 10:49-9.8(b)(4), providers agree "[t]hat the services billed on any claim and the amount charged therefore, are in accordance with the requirements of the New Jersey Medicaid and/or NJ FamilyCare programs[.]"

40.     Prior to being authorized to submit Medicaid claims for reimbursements, all providers are required to sign a New Jersey Medicaid provider agreement Form FD-62/ Medicaid 3031-M Ed 6. This agreement requires all providers to acknowledge that they will "comply with all applicable State and Federal Medicaid laws and policies, and rules and regulations promulgated pursuant thereto." The agreement also requires compliance with Section 1909 of P.L. 92-603, and Section 2428, which makes it a crime for persons found guilty of making any false statement or representation of a material fact in order to receive any benefit or payment under Medicaid.

41.     Furthermore, in many states, including New Jersey, Medicaid providers, including both physicians, laboratories, imaging centers and other specialty providers, must affirmatively certify compliance with applicable federal and state laws and regulations.

42.     In the claim form, (CMS-1500) the provider further certifies that "[i]n submitting this claim for payment from federal funds, I certify that: (1) the information on this form is true, accurate and complete; (2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; (3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; (4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark Law)." *See* State of

New Jersey, DHA, DMAHS "New Jersey Medicaid Management Information system (NJMMIS)" Fiscal billing supplement - Physicians.

43.    Hospitals in New Jersey such as Defendants Summit Oaks and Hampton Hospital submit New Jersey Medicaid claims on a CMS-1450 or UB-04 Form.  Page two of the form has the following language: "NOTICE: THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)."

44.    The form also states that "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." *See* State of New Jersey, DHA, DMAHS "New Jersey Medicaid Management Information system (NJMMIS)" Fiscal billing supplement – Hospitals.

### 3.    Medicare Program

45.    In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or kidney transplant).

46.    Medicare now has four parts:  Part A, Part B, Part C, and Part D.

47.    Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care.

10

48.     Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, as well as other medical services not covered by Part A such as "durable medical equipment" including HME equipment and supplies. Part B also helps pay for covered health services and supplies when they are medically necessary.

49.     Medicare Part C, also known as "Medicare Advantage," is a managed care program that can be utilized by Medicare beneficiaries as a replacement for benefits otherwise generally available under Medicare Parts A and B, as described above. Medicare Part C is federally funded through contracts with private commercial insurance carriers who pay claims on behalf of Medicare beneficiaries.

50.     Medicare Part D (Prescription Drug Plan) provides beneficiaries with assistance in paying for out-patient prescription drugs.

51.     Payments from the Medicare Program come from a trust fund, known as the Medicare Trust Fund, which is funded through payroll deductions taken from the workforce, in addition to government contributions. Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

52.     The Medicare Program is administered through the United States HHS and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

53.     Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the Federal Government.

54.     Under Medicare Part A, contractors serve as "fiscal intermediaries," administering Medicare in accordance with applicable rules and regulations.

11

55.    Under Medicare Part B, the Federal Government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers", are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

56.    Under Medicare Part C (Medicare Advantage), the Federal Government provides funding and contracts with private insurers who provide CMS-approved managed care insurance plans to provide health care services and supplies to Medicare beneficiaries. A Medicare beneficiary must affirmatively enroll in one of the many Medicare Advantage plans offered by private insurers to receive benefits as provided in the relevant plan in lieu of receiving benefits under Medicare Parts A and B.

57.    Under Medicare Part D, Medicare beneficiaries must affirmatively enroll in one of many hundreds of Part D plans ("Part D Sponsors") offered by private companies that contract with the Federal Government. Part D Sponsors are charged with and responsible for accepting Medicare Part D claims, determining coverage, and making payments from the Medicare Trust Fund.

58.    The principal function of both intermediaries and carriers is to make payments for Medicare services, and to audit claims for those services, to assure that federal funds are spent properly.

59.    To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent they are medically necessary. Medicare will only reimburse costs for medical services that are needed for that prevention, diagnosis, or treatment of a specific illness or injury.

12

60.     Medicare Part B provides "fee for service" reimbursements for non-hospital use of "durable medical equipment" such as the claims for use of CPAP equipment and supplies, as well as oxygen concentrators, at issue in this case. Thus, the Medicare false claims at issue in this case were submitted under Part B.

### 4.     Other Federal Health Care Programs

61.     In addition to Medicare and Medicaid, the Federal Government reimburses a portion of the cost of prescription medication, equipment, and supplies under several other federal health care programs, including but not limited to, TRICARE, CHAMPVA and the Federal Employees Health Benefit Program ("FEHBP").

62.     TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veteran Affairs, is a health care program for the families of veterans with a 100 percent service-connected disability.  FEHBP, administered by the United States Office of Personnel Management, provides health insurance for hundreds of thousands of federal employees, retirees, and survivors.

### B.     THE FEDERAL FALSE CLAIMS ACT

63.     The federal False Claims Act is the Government's chief fraud fighting tool and has been used successfully since its passage in 1863 under President Lincoln to return billions of stolen dollars to the public fisc, save lives and prevent future harm. It prohibits false and/or fraudulent claims from being submitted to government programs.

64.     The False Claims Act, 31 U.S.C. § 3729(a)(1), provides, in pertinent part, that:

> Any person who . . . (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires [to do so]

13

\* \* \*

is liable to the United States Government for a civil penalty of not less than [$13,946] and not more than [$27,894] [as amended] . . . plus three times the amount of damages which the Government sustains because of the act of that person.

65.    For purposes of the FCA, "the terms 'knowing' and 'knowingly' (A) mean that a person, with respect to information. (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud," 31 U.S.C. § 3729(b)(1).

66.    The term "claim" is defined to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property," that is made to contractors and agents of Federal Government programs. 31 U.S.C. § 3729(b)(2).

67.    Compliance with relevant regulations is material to the government's decision to pay claims for medical services. "In general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995); *cited by Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016)).

68.    Under the False Claims Act, the United States Government is entitled to recover three times the amount of damages which it sustained because of the false claims in addition to and a civil penalty, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 for each violation of the statute.

14

69.     The current civil penalties as of the filing of this Complaint are at least $14,308 and up to $28,619, as adjusted for inflation, for each such false or fraudulent claim. 28 C.F.R. § 85.5 (setting civil penalties).

## C.     THE NEW JERSEY FALSE CLAIMS ACT

70.     This action is also filed under the New Jersey False Claim Act, N.J.S.A.§§ 2A:32C-1, *et seq.* (hereinafter "NJFCA").

71.     N.J.S.A. § 2A:32C-3 subjects to liability a person who:

(a)     Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval; [or]

(b)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State[.]

72.     The NJFCA subjects such persons to liability to the State of New Jersey for a civil penalty of not less than $14,308 and up to $28,619 for each false or fraudulent claim, as adjusted for inflation, plus three times the amount of damages that the State sustains because of the act of such person. N.J.S.A. § 2A:32C-5(b) allows a private person to bring a civil action in the name of the State of New Jersey for violation of the NJFCA.

## V.     DEFENDANT UHS' HISTORY OF DEFRAUDING GOVERNMENT PROVIDERS

73.     In addition to receiving billions of dollars of revenue from government insurance payors, Defendant UHS receives federal and state government funding in the form of procurements and grants.

15

74. According to Defendant UHS's "Code of Conduct,"[1] the company purports to "respect and abide by all applicable laws, rules and regulations," and the company directs employees to report violations of "applicable laws, rules and regulations, in confidence and without fear of retaliation."

75. However, as set forth throughout this Complaint, Defendant UHS systematically and intentionally violated material federal and state laws and regulations in the provision of mental and behavioral health services.

76. This is not new behavior for Defendant UHS. As Defendant UHS has grown over the decades, the company has garnered a reputation for engaging in widespread tactics aimed at maximizing profit and shareholder returns at the expense of patient care and safety.

77. For instance, In July 2020, Defendants Universal Health Services, Inc. and UHS of Delaware, Inc. agreed to pay $117 million to the Federal Government "to resolve alleged violations of the False Claims Act for billing for medically unnecessary inpatient behavioral health services and failing to provide adequate and appropriate services."

78. According to the press release from the settlement with the U.S. Department of Justice, "[t]he government alleged that between January 2006 and December 2018, UHS facilities admitted as patients federal healthcare beneficiaries who were not eligible for inpatient or residential treatment because their conditions did not require that level of care, while also failing to properly discharge appropriately admitted beneficiaries when they no longer required inpatient care." The government further alleged that "UHS facilities billed for services not rendered, billed for improper and excessive lengths of stay, failed to provide adequate staffing, training, and/or

---

[1] https://ir.uhs.com/static-files/638baa90-5bc9-4987-84fa-b53e5d7a6e8d#:~:text=You%20should%20endeavor%20to%20protect,use%20may%20be%20permi%3Eed

16

supervision of staff, and improperly used physical and chemical restraints and seclusion. In addition, UHS facilities allegedly failed to develop and/or update individual assessments and treatment plans for patients, failed to provide adequate discharge planning, and failed to provide required individual and group therapy services in accordance with federal and state regulations."[2]

79.    Defendant UHS' tactics have also been reported publicly, with one news source documenting that current and former employees of Defendant UHS's behavioral and psychiatric health facilities were "under pressure to fill beds by almost any method--which sometimes meant exaggerating people's symptoms or twisting their words to make them seems suicidal--and to hold them until their insurance payments ran out."

80.    According to an expose by Buzzfeed News, "[s]everal people who ran UHS hospitals said corporate bosses pushed them to cut their hospitals' staff further and further each year, regardless of the impact on employees' safety or on their ability to care for the people being admitted."

81.    Ultimately, Defendant UHS behavioral health facilities, including Defendants Summit Oaks and Hampton Hospital, are operated, controlled, and managed by Defendant UHS with a primary objective: increase the number of patients, maximize profits, increase revenue, decrease costs and overhead, and maximize shareholder value.

82.    Defendant UHS has also been public and unabashed about its goal of maximizing profit and shareholder value through increasing patient admissions.

83.    Indeed, in a Q3 2023 earnings call, Defendant UHS chief financial officer Steve Filton stated that "increasing occupancy is the most significant opportunity we see in our

---

[2] https://www.justice.gov/usao-edpa/pr/universal-health-services-inc-pay-117-million-settle-false-claims-act-allegations

17

behavioral business." Mr. Filton further stated that UHS has "the ability to increase occupancy significantly" into the future.  In another earnings call that year, Mr. Filton acknowledged a corporate strategy of "simply admitting patients whose insurance will pay us more."  In order to effectuate the business "opportunity" presented by increased occupancy, UHS intentionally engages in tactics to promote and induce—often without the consent or agreement of patients-- unnecessary stays or unnecessarily prolonged stays of patients at its facilities.  The purpose of inducing unnecessary or unnecessarily prolonged stays is to maximize the amounts billed to and recovered from insurers, including public payors.

## VI.    DEFENDANT UHS' CONROL OVER DEFENDANTS SUMMIT HEALTH AND HAMPTON HOSPITAL

84.    At all times relevant hereto, Defendant UHS tightly controlled all material aspects of the day-to-day management and operations of Defendants Summit Oaks and Hampton Hospital, including the following:

a.    Directly or indirectly hiring, training, supervising, and/or compensating employees;

b.    Procurement of contracts;

c.    Creation and implementation of policies and procedures, including those affecting intake and discharge of patients;

d.    Creation and implementation of billing practices;

e.    Creation and implementation of clinical education;

f.    Advertising of services; and

g.    Financing operations and overhead.

85.    By way of example of the exacting level of corporate control that Defendant UHS exerted over Defendant Summit Oaks, every year, Relator, as CEO, went through a lengthy

18

process, beginning in August and ending in November, to prepare for Defendant UHS an annual budget for Defendant Summit Oaks for the following year. This annual budget ultimately had at least 10 columns and 650 lines of data, identifying every material expected category of expense and revenue, including from government payers, broken down by month. Defendant UHS approved that annual budget in November of the prior year.

86. Then, each month, Relator prepared multiple financial reports for Defendant UHS, which served to identify how Defendant Summit Oaks was performing in comparison with that annual budget. Relator also delivered at least *four* additional financial reports *every week* to Defendant UHS, plus at least *three additional reports* during the month: a (i) mid-month projection, (ii) final month projection, and (iii) report closing out the month with the final monthly numbers. In addition, at the end of year, Relator prepared a final report for how Defendant Summit Oaks actually performed during the year.

87. Supervisors at Defendant UHS then scrutinized all aspects of each of these financial reports, analyzing whether Defendant Summit Oaks, as a portfolio company, was meeting its annual budget numbers or underperforming, and if so in which specific ways it was underperforming. Defendant UHS held regular calls each week with Relator to go over the financial reports for Defendant Summit Oaks.

88. Defendant Summit Oaks, like other portfolio companies for Defendant UHS, also could not make any material expenditure decisions, including any capital expenditures at all, without the written prior approval of a supervisor at Defendant UHS.

89. Relator observed the same process and scrutiny by Defendant UHS for the operations at Defendant Hampton Hospital.

19

90.    Of particular significance for the allegations in this Complaint, the annual budget Relator sent to Defendant UHS, and multiple other financial reports Relator sent to Defendant UHS each week and month, *specifically identified the categories of fraudulent billing identified in this Complaint*, including the volume of "adult rehab" services, and the volume or "IOP" services.

91.    In addition to these financial reports, Relator prepared PowerPoint presentations about the financial reports, and held calls with supervisors at Defendant UHS, to go over the details about Defendant Summit Oaks' finances and operations each month.

92.    The following is an example of a PowerPoint slide Relator sent to two of his supervisors at Defendant UHS, Senior Vice President Gary Gilberti and Division Vice President Michael McDonald, sent in conjunction with discussing one of the financial reports Relator had sent to Defendant UHS.  The slide illustrates how "in the weeds" supervisors at Defendant UHS were with respect to the day-to-day management of Defendant Summit Oaks.

**UHS** — Perry Iasiello · Summit Oaks

**MICHAEL MCDONALD/GARY GILBERTI REGION**
**Week Ending May 30th, 2025**

**STRENGTHS:**

- Orientation scheduled for 6/2/2025 includes 1 FT RN, 2FT MHA, 2PD MHA, 1 CFO
- PHP days exceeding MTD
- CMO candidate start date confirmed July 18th
- CFO candidate starts June 2nd

**OPPORTUNITIES/WINS:**

- BD Updates: Met with Lyra Health. Raritan Bay Lunch & Learn with Crisis, ED teams. Met with Warren Peer Recovery Coaches.
- 150-180 Cash Received $9,708.00
- FTE management continuing yield results to stay on or below budget
- Workforce reduction plan was completed
- TU3 psych safe upgrades approved, work being scheduled
- Relay system running on all units to improve rounding compliance

**WEAKNESSES:**

- MTD ADC variance reduced to -0.8
- 1:1 over budget MTD but moving closer to budget
- Permedion audit findings grow to 590K
- Child / Adolescent psychiatrist recruitment continues. Vacancy being covered by a per diem.

**THREATS:**

- NJ Managed Medicaid moving toward classifying substance use rehab level of care as ambulatory – start date moved to 2026
- NJ DOH issuing concerns about federal matching dollars to Medicaid and supplemental payments being cut on top of looming deficits
- Permedion audits continues focusing on hospital-based SUD level of care reaching back 12 to 18 months (TU2).  $590k YTD.
  Plan:
  - Immediate changes in admission criteria for TU2 to match payer requirements.
  - Re-educate admissions, business development, and nursing to the required changes.
  - Work with contracted architects and design and construction project manager to convert treatment unit 2 from its current state to adult psychiatric dual diagnosis beds. An initial meeting with the architect was held on May 23.  After plan approvals by DOH licensing and DCA they anticipate construction to begin in Q2 2026.

1

## VII.    THE DEFENDANTS' FRAUDULENT BILLING SCHEMES

93.    Relator began working as the Chief Executive Officer of Defendant Summit Oaks in March 2024, following a series of other senior management roles at other healthcare facilities.

94.    One reason Relator was hired was because he was and is fully familiar with the federal and New Jersey state laws and regulations guiding behavioral health and withdrawal management facilities, as well as how these facilities would bill Medicaid, Medicare and other government programs, for services performed.

95.    Executives at Defendant UHS interviewed and hired Relator for the position. As noted above, Defendant UHS closely managed every aspect of the operations of Defendants Summit Oaks and Hampton Health and were aware of, and indeed directed, the fraudulent billing schemes described in this Complaint.

96.    NJDOH licenses health care facilities in the state to provide prescribed services, and those health care providers may only perform, and bill for, those services for which they are specifically licensed.

97.    Defendant Summit Oaks and Defendant Hampton Hospital had licenses from the NJDOH for specific behavioral health services.

98.    Defendant Summit Oaks and Defendant Hampton Hospital were not permitted to perform, or seek reimbursement for, services for which the facilities were not licensed to perform.

99.    After Relator became CEO of Defendant Summit Oaks, Relator observed two major ways in which Defendant Summit Oaks—as well as its sister facility, Defendant Hampton Hospital, for one of those frauds—with the full knowledge, direction and approval of Defendant UHS, were regularly performing services without a license to do so, and were falsely billing the Federal Government and State of New Jersey with false codes.

21

A.    THE "RESIDENTIAL REHAB" FRAUD

1.    Inpatient Withdrawal Management Services vs. Residential Rehabilitation Treatment Services

100.    During all relevant times, Defendant Summit Oaks had a license from NJDOH for 20 "inpatient alcohol" beds.  Defendant Summit Oaks called this 20-bed unit "Treatment Unit 2."

101.    Relator came to learn that the vast majority of the patients that Defendant Summit Oaks treated and billed the Federal Government and State of New Jersey in this Treatment Unit 2 were not for *inpatient withdrawal management services*, but instead were for *residential rehabilitation services* Defendant Summit Oaks was not licensed or otherwise authorized to perform, and for services which it in fact did not perform.

102.    The distinction between *inpatient withdrawal management services* and *residential rehabilitation services* is a significant one.

103.    Inpatient withdrawal management treatment must be provided in a hospital or similar acute care setting, while residential rehabilitation treatment services did not.

104.    Consistent with the higher level of care, during all relevant times, the Medicaid and Medicare billing reimbursement rates for inpatient withdrawal management services was always significantly higher than it was for residential rehabilitation treatment services.

105.    In addition, during all relevant times, the volume of patients in New Jersey needing residential rehabilitation treatment services was always much higher than it was for inpatient withdrawal management services.  However, the number of facilities who could provide residential rehabilitation treatment services was also always much higher than it was for the inpatient withdrawal management services, which required a hospital or similar acute care setting.

106.    Importantly, at all relevant times, Defendant Summit Oaks was never licensed by NJDOH nor otherwise authorized to provide residential rehabilitation treatment services to patients.

107.    Further, at all relevant times, Defendant Summit Oaks could not actually provide residential rehabilitation services, since Defendant Summit Oaks did not meet the regulatory requirements of N.J.A.C. § 10:161A to provide these residential rehabilitation services.

108.    For example, during all relevant times, Defendant Summit Oaks did not meet any of the following regulatory qualifications under N.J.A.C. § 10:161A to provide residential rehabilitation services:

a.   N.J.A.C. § 10:161A-1.9 (requiring specific staff-patient ratios for "substance abuse counseling staff");

b.   N.J.A.C. § 10:161A-1.8(5) (to have on staff a "New Jersey licensed physician who is certified by the American Society of Addiction Medicine, or is a Board-certified psychiatrist, and has at least two years of supervisory experience in addiction services");

c.   N.J.A.C. § 10:161A-3.5(a)(2) (to "initiate State-level criminal history background checks supported by fingerprints not later than the time of hiring all staff, including student interns and volunteers");

d.   N.J.A.C. § 10:161A-10.3 (to "provide support services in accordance with its client care policies governing financial arrangements established pursuant to N.J.A.C. 10:161A-6.2");

e.   N.J.A.C. § 10:161A-3.6(b)(15) (to have "[p]olicies and procedures governing the delivery of services that include, at a minimum . . . [i] The frequency of counseling

23

interventions and didactic sessions, including a weekly and monthly posted written schedule of all program activities; and [ii] The content of didactic sessions, including a written description or curriculum of didactic sessions offered in the facility.");

f.  N.J.A.C. § 10:161A-10.1(b) (to "maintain a ratio of substance-abuse-counselors-to-clients on the basis of each facility's daily census");

g.  N.J.A.C. § 10:161A-10.1(c) (to "provide each client education with respect to the client's drug, alcohol and tobacco use, risk of exposure to AIDS and Hepatitis, other health consequences of substance abuse and dependence, relapse prevention, needs of clients with co-occurring disorders and gender-specific issues such as domestic violence, parenting and sexual abuse"); and

h.  N.J.A.C. § 10:161A-26.3 ("Existing licensed facilities shall have 70 square feet of floor space for single rooms and 50 square feet of floor space per resident in multi-bed rooms.").

### 2.    2018 DMAHS Emergency Expansion

109.    In 2018, amidst the explosion of the opioid crisis in New Jersey and across the country, DMAHS, among other measures, took steps to expand the number of hospitals or other acute care facilities who could provide inpatient withdrawal management services for patients.

110.    That year, DMAHS issued two orders that had the effect of allowing Defendant Summit Oaks to provide inpatient withdrawal management services for specific types of opioid use disorder patients, even though Defendant Summit Oaks was not specifically licensed to provide these services.    But, DMAHS never expanded the authority to include residential rehabilitation services.

24

111.    On July 1, 2018, in a published newsletter, Volume 28, No. 7, issued to "Hospital Providers," with a subject line "Acute Medical Detoxification," DMAHS described "changes in payment for inpatient medical detoxification claims."

112.    DMAHS first announced that it was adopting a new assessment standard, from the American Society of Addiction Medicine ("ASAM"), to determine which patients were entitled to Medicaid coverage for inpatient medical detoxification services, including patients who required withdrawal management ("WM") treatment.

113.    Next, DMAHS announced that individuals meeting ASAM Level 4.0 "will be approved and services shall be authorized" by the Medicaid-approved managed care plan for inpatient substance abuse services.  But, DMAHS said, individuals meeting the lower ASAM Level 3.7-WM (or below) "shall be denied for acute care services."

114.    ASAM Level 4.0 is defined as "Medically Managed Intensive Inpatient Withdrawal Management," which, DMAHS said, "is equivalent to an acute inpatient service." DMAHS noted that it was not covering ASAM Level 3.7-WM, "Medically Monitored Inpatient Withdrawal Management," which, DMAHS said, "can be provided in a subacute hospital setting or in an outpatient setting."

115.    In short, DMAHS was allowing hospitals or other acute care facilities like Defendant Summit Oaks to provide inpatient withdrawal management services to patients who were ASAM Level 4.0, even if those facilities were not specifically licensed by NJDOH to provide those inpatient withdrawal management treatment services.  Driven by the emergency of the opioid epidemic, DMAHS opened up the field of New Jersey hospitals who could provide inpatient withdrawal management services for a type of patient needing high level and serious withdrawal management care.

116. For Defendant Summit Oaks at the time, this meant that Defendant Summit Oaks could treat and seek Medicaid reimbursement for patients who had ASAM 4.0—something it was not able to do before since it did not have a specific license from NJDOH for those services. But Defendant Summit Oaks still could not treat and bill Medicaid or Medicare for ASAM 3.7 WM or lower, since Defendant Summit Oaks was neither licensed to provide services for those patients, nor permitted to provide them by the new DMAHS directive.

117. A few months later, after receiving feedback from providers in the behavioral health care community, DMAHS expanded its position one step further.

118. On October 1, 2018, DMAHS issued a letter to each "Acute Care Hospital Provider" in the state—Defendant Summit Oaks being one—with the subject line: "Coverage in an Inpatient Acute Care Hospital of ASAM 3.7 WM."

119. DMAHS said that in light of the ongoing opioid crisis, it was modifying the July 2018 directive to allow for coverage for patients at ASAM 3.7 WM and higher, explaining that as a result of the July 1, 2018 change, "it became evident that there is need for 3.7 WM treatment in an acute care setting [to] meet the capacity and demand for SUD [substance use disorder] services."

120. Therefore, DMAHS wrote, DMAHS had decided to provide "coverage of ASAM Level 3.7 WM inpatient medical detoxification services in an acute care setting."

121. The October 1, 2018 also confirmed and clarified that, in light of the volume of opioid patients needing treatment because of the opioid crisis, a licensed hospital (such as Defendant Summit Oaks) did not need to have a specific license from NJDOH for withdrawal management services in order to provide withdrawal management services to patients, and receive reimbursement from Medicaid for those services. The October 1, 2018 DMAHS notice stated the following, quoting from a NJDOH statement:

26

[NJ]DOH wants to clearly state that there is no prohibition, either explicit or implicit, in the licensing requirements for general hospitals that should be used to deny appropriate reimbursement to general hospitals for providing inpatient addiction beds/services to all clinically eligible patients and without regard to whether the clinical ASAM score is 3.7WM or 4.0.

122. What this now meant for Defendant Summit Oaks—a licensed New Jersey hospital providing services in an "acute care setting"—was that Defendant Summit Oaks could provide services for patients who met ASAM 3.7 WM or higher and receive Medicaid reimbursement for those services. But for patients with acuity levels at ASAM 3.5 or lower, Defendant Summit Oaks still could not provide or receive reimbursement for services.

123. This change was financially beneficial for Defendant Summit Oaks and its corporate owner, Defendant UHS, since Defendant Summit Oaks could now treat, and bill Medicaid and other government providers for, a new category of patients in need of serious treatment for withdrawal management at ASAM 3.7 WM or higher, for which Defendant Summit Oaks could not previously treat and bill.

124. But this expansion by NJDOH—to allow licensed hospitals like Defendant Summit Oaks to provide withdrawal management services in an acute care setting to patients at ASAM 3.7 WM or higher—did not change the fact that Defendant Summit Oaks was still not licensed or authorized to provide and seek Medicaid reimbursement for the higher and more common volume of ASAM 3.5 patients seeking residential rehabilitation services.

### 3. Relator Discovers Multiple Aspects of the Residential Rehabilitation Services Billing Fraud

125. Soon after Relator began working at Defendant Summit Oaks in May 2024, Relator discovered the residential rehabilitation services billing fraud.

27

126. Relator saw that Defendant Summit Oaks was regularly filling the 20 beds in Treatment Unit 2 with residents requiring inpatient residential rehabilitation services at ASAM 3.5 or lower.

127. Based on Relator's review of internal accounting records, it appeared to Relator that Defendant Summit Oaks had been improperly billing for residential rehabilitation services for ASAM 3.5 patients for years, apparently beginning soon after the DMAHS changes in 2018.

128. Relator observed that Defendant Summit Oaks was therefore providing a form of treatment to a high volume of ASAM 3.5 patients, and seeking and receiving Medicaid reimbursement for those treatments, for residential rehabilitation services that (i) Defendant Summit Oaks was not licensed by NJDOH to provide, (ii) DMAHS, in its 2018 emergency directives, did not otherwise authorize Defendant Summit Oaks to perform, and (iii) Defendant Summit Oaks did not actually provide to patients.

129. Relator also observed that Defendant Summit Oaks, with the full knowledge, approval and direction of Defendant UHS, engage in fraudulent billing practices for patients who were *initially* properly treated by Defendant Summit Oaks, but then should have been discharged from Defendant Summit Oaks to continue treatment at another, appropriate, rehabilitation facility.

130. Relator observed that in many cases where Defendant Summit Oaks had successfully treated patients at ASAM 3.7 WM, Defendant Summit Oaks then transferred the patient to Treatment Unit 2 for a longer "rehab" stay, even though Defendant Summit Oaks had no authority to treat patients at that level.

131. Put another way, when a patient treated by Defendant Summit Oaks with acuity levels appropriate for Defendant Summit Oaks' level of care (i.e. ASAM 3.7 WM or higher) had improved, the patient then needed a lower level of care (ASAM 3.5 or lower) at a residential

28

rehabilitation (not a hospital) setting, which was not what Defendant Summit Oaks provided and was outside of Defendant Summit Oaks' licensed authority.

132.    Yet, as a business practice, Defendant Summit Oaks, at the direction of Defendant UHS, still kept those patients at Defendant Summit Oaks even though Defendant Summit Oaks was not licensed or otherwise authorized to treat the patients.

### 4.    Defendant Summit Oaks' Internal Records Identify the Scope of the Residential Rehabilitation Services Billing Fraud

133.    Relator also saw that the details and scope of Defendant Summit Oaks' fraud was clearly identifiable in Defendant Summit Oaks' own internal records.

134.    Defendant Summit Oaks identifies by "Revenue Code" what services are being performed for each patient.

135.    "Revenue Code 0126" is for inpatient detoxification services at ASAM 3.7 WM— *i.e.* a service for which Defendant Summit Oaks was permitted to perform under the DMAHS 2018 emergency orders.

136.    "Revenue Code 0128," on the other hand, is for residential rehabilitation services at ASAM 3.5 or lower —*i.e.* services for which Defendant Summit Oaks was *not* licensed to perform.

137.    Thus, one way to identify the full scope of Defendants' residential rehabilitation services billing fraud is to identify all reimbursement claims by Defendant Summit Oaks identifying Revenue Code 0128 for the services performed.

### 5.    Patient AO

138.    Patient AO is a representative example of the residential rehabilitation services billing fraud by Defendant Summit Oaks and Defendant UHS.

139. Patient AO was treated by Defendant Summit Oaks beginning on November 30, 2023.

140. Defendant Summit Oaks' records initially list Revenue Code 0126 as the treatment, indicating inpatient detoxification services at ASAM 3.7 WM—*i.e.* a service for which Defendant Summit Oaks was authorized to perform.

141. For four days, Defendant Summit Oaks billed Medicaid for $7,400, through the New Jersey managed care organization ("MCO") Aetna Better Health of New Jersey, for those inpatient detoxification services for which Defendant Summit Oaks was permitted to perform.

142. But then the records show that for the next 11 days, Patient AO was treated under Revenue Code 0128, indicating residential rehabilitation services at ASAM 3.5 or lower —*i.e.* services for which Defendant Summit Oaks was *not* licensed to perform

143. Defendant Summit Oaks submitted Medicaid reimbursement claims, and was paid, for 11 days of these services for which Defendant Summit Oaks was not licensed to perform or bill. In all, Defendant Summit Oaks billed Medicaid and received back $20,350 for these services.

| REV. CO | DESCRIPTION | HCPCS/RATE/HIPPS CODE | SERV. DATE | SERV. UNITS | TOTAL CHARGES | |
|---|---|---|---|---|---|---|
| 0126 | Room & Board-Semiprivate | 1850.00 | | 4 | 740000 | |
| 0128 | Room & Board-Semiprivate | 1850.00 | | 11 | 2035000 | |

144. Defendant Summit Oaks' Medicaid reimbursement claims for these 11 days were false and fraudulent, because Defendant Summit Oaks was not licensed or otherwise authorized to perform, and did not perform, the residential rehabilitation services submitted and claimed.

### 6. Patient FO

145. Patient FO is another representative example of the residential rehabilitation services billing fraud by Defendant Summit Oaks and Defendant UHS.

146.    Patient FO was treated by Defendant Summit Oaks beginning on April 6, 2024, based on Revenue Code 0126, indicating inpatient detoxification services at ASAM 3.7 WM—*i.e.* a service for which Defendant Summit Oaks was allowed to perform.

147.    For six days, Defendant Summit Oaks billed Medicaid (through an MCO), for $11,100.

148.    But after six days, Defendant Summit Oaks shifted Patient FO to Revenue Code 0128, indicating residential rehabilitation services at ASAM 3.5 or lower—*i.e.* services for which Defendant Summit Oaks was *not* licensed to perform.

149.    Defendant Summit Oaks billed Medicaid for 19 days for these services for which it was not licensed to perform, for $35,150.

| 42 REV CD. | 43 DESCRIPTION | 44 HCPCS / RATE / HIPPS CODE | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES |
|---|---|---|---|---|---|
| 0124 | Room & Board-Semiprivate | 1850.00 | | 6 | 1110000 |
| 0128 | Room & Board-Semiprivate | 1850.00 | | 19 | 3515000 |

150.    Defendant Summit Oaks' Medicaid reimbursement claims for these 19 days were false and fraudulent, because Defendant Summit Oaks was not licensed to perform, and did not perform, the services claimed.

### 7.    Defendant UHS's Financial Incentives for the Rehabilitation Services Billing Fraud

151.    Relator observed Defendant Summit Oaks' significant financial motivation for this fraud.

152.    As noted, in New Jersey during all relevant times, the volume of patients requiring residential rehabilitation services was always much higher than the volume of patients requiring inpatient behavioral health or withdrawal management services.

153.    Defendant Summit Oaks also could not fill the beds in Treatment Unit 2 for solely providing inpatient behavioral health or withdrawal management services at ASAM 3.7 WM or higher.

154.    Further, servicing patients at ASAM 3.5 or lower significantly increased the patient's length of stay at Defendant Summit Oaks, which generated additional revenue.

155.    Therefore, while Defendant Summit Oaks should have referred ASAM 3.5 patients to residential facilities who were licensed and available to provide those residential rehabilitation services, Defendant Summit Oaks instead, at Defendant UHS's knowledge and direction, kept these ASAM 3.5 patients in its Treatment Unit 2.

156.    Indeed, Relator observed that Defendant UHS mandated that its hospitals, including Defendant Summit Oaks, follow the Defendant UHS "model" of extending patient stay time, and treating patients outside of its licensure, in order to maximize profits.

157.    Each year, Defendant UHS designed a plan for Defendant Summit Oaks and other Defendant UHS behavioral health hospitals to admit a certain number of patients to each unit. This plan was set forth in each hospital's annual budget, directed by Defendant UHS.

158.    Defendant UHS gave financial rewards to those in charge of hospitals in the Defendant UHS portfolio who met the budgeted patient volume or even exceeded the budget ("positive variances").    But Defendant UHS punished those managers—including Relator's predecessor as CEO of Defendant Summit Oaks—who failed to meet the budgeted patient volume ("negative variances") with financial penalties in terms of reduced bonuses, demotion, or discharge.

**8.    Defendant UHS Assures Relator that the Residential Rehabilitation Services Billing Practices Are Proper**

159.    In Spring 2024, when Relator first discovered the residential rehabilitation services billing fraud, Relator discussed the issue with one of his UHS supervisors, Craig Hilton, the UHS Group Director and also the CEO of Defendant Hampton Hospital.

160.    During all relevant times, Relator reported to Hilton, who directly reported to Defendant UHS' Regional Vice President Michael S. McDonald, Jr.

161.    In Spring 2024, Hilton told Relator that Defendant Summit Oaks was not licensed to perform the residential rehabilitation services under Revenue Code 128, and that Defendant Summit Oaks had been billing for residential rehabilitation services using Revenue Code 128 for years.  But Hilton said that Relator should not worry about the issue because Defendant Summit Oaks had been "*grandfathered*" in with DMAHS.

162.    Thus, Defendant UHS instructed Relator not to take action to stop Defendant Summit Oaks' treatment of ASAM 3.5 patients or to correct the residential rehabilitation services billing practice, and instead falsely assured Relator that the billing practices were proper and lawful.

**9.    DMAHS/Permedion Audit**

163.    It was not until April 2025 that Relator learned Hilton's claims that Defendant Summit Oaks was "grandfathered" in were wrong.  It appeared to Relator that Hilton's claims were deliberately made to keep Relator from taking action that would have caused the reduction of revenues and profits to Defendant UHS.

164.    DMAHS hires third party auditing companies to perform regular audits on healthcare providers who submit Medicaid reimbursement claims to it.

33

165.    DMAHS engaged Permedion Inc. as one of those auditors, and Defendant Summit Oaks was regularly subject to Permedion audits.  Each Permedion audit was identified by a "Cycle."

166.    DMAHS/Permedion paused auditing activity during the COVID-19 pandemic.  But by Spring 2025, Permedion audit "Cycle 15" of Defendant Summit Oaks was ongoing and coming to a resolution.

167.    While prior Permedion audits apparently failed to identify the Revenue Code 128 problem at Defendant Summit Oaks, Permedion's Cycle 15 flagged the problem front and center.

168.    In Spring 2025, Permedion's Cycle 15 reviewed a sample of Defendant Summit Oaks' reimbursement claims from December 2023 and the first quarter of 2024, and found about $410,000 in improper billing for these ASAM 3.5 violations.  By the time Relator had resigned from Defendant Summit Oaks, Permedion was engaged in Cycle 16 of its audit and finding additional violations.

169.    Relator reviewed the Permedion audit results and saw that Permedion was correct in its findings, meaning that Defendant Summit Oaks had been falsely billing Medicaid, Medicare, and other government providers, for years for patients at ASAM 3.5 levels.

170.    Relator attended calls held directly between Defendant UHS and the DMAHS Assistant Division Director Steve Tunney to discuss the Permedion audit results.  Relator also attended internal conference calls with officers of Defendant UHS to review and analyze the Permedion audit results.

171.    Relator saw that supervisors at Defendant UHS understood and acknowledged that the Permedion audit finding concerning the residential rehabilitation services billing practices was correct.  And, Relator saw, Defendants Summit Oaks and UHS had no good faith basis to believe

34

the practice was ever permitted.  To the contrary, as the Permedion audit revealed, Defendant Summit Oaks never had any good faith or reasonable basis to believe it could treat ASAM 3.5 patients and seek Medicaid or Medicare reimbursement for those services.

> **10.    Relator Attempts to Bring the Residential Rehabilitation Services Billing Fraud to an End, Over Defendant UHS Resistance**

172.    By the end of May 2025, Relator felt personally compelled to attempt to put the residential rehabilitation services billing fraud by Defendant Summit Oaks to an end.

173.    At Relator's insistence, and despite the explicit resistance of Relator's supervisors at Defendant UHS, on May 29, 2025, Relator issued the following memorandum to staff and UHS supervisors describing the change in practice:

05.29.2025                    **Memo**

TO
Clinical Staff

FROM
Perry Iasiello
CEO

CC
Business Office
BD Team

RE
ASAM Level 3.5

I am writing to inform you of an important update regarding our patient care protocols. Effective immediately, we will no longer be admitting patients seeking an ASAM 3.5 level of care. ASAM 3.5 level of care is defined as community-based residential treatment. This change also effects patients currently receiving detox services (ASAM 3.7 WM) on our units. Once these patients are stabilized, they will need to be referred to the proper level of community-based care.

This decision was made after careful consideration of our current resources and the need to ensure that we can provide the highest quality of care while remaining in compliance with the regulations governing our hospital. By focusing on the levels of care that we can support most effectively, we aim to enhance the overall patient experience and outcomes.

Important to note, there are no changes to psychiatric admissions protocols. No unit closures or bed reductions are planned. To be clear, for substance involved patients, we will continue to admit ASAM 3.7 and ASAM 3.7 WM if they meet criteria. All cases will continue to be evaluated and subject to prior authorization prior to admission.

Please ensure that any potential referrals or inquiries related to ASAM 3.5 level patients are directed accordingly. Your cooperation in communicating this change to relevant stakeholders is greatly appreciated.

If you have any questions or need further clarification, please do not hesitate to reach out.

35

174. Officers at Defendant UHS, including Group Director Craig Hilton, urged Relator not to issue this memorandum, and also warned Relator of the financial repercussions that Defendant UHS would impose on Relator for the move through reduced pay if Defendant Summit Oaks lost patients and revenue because of the change.

175. As noted, Defendant UHS gave financial rewards to those in charge of hospitals in the Defendant UHS portfolio who had "positive variances" for meeting budget projections, and punished those managers who had "negative variances" with lower pay and job insecurity. Relator's decision to stop admitting ASAM 3.5 patients would surely lead to "negative variances" for Relator, negatively impacting his compensation and ability to retain his position.

176. But Relator explained to his supervisors that it had to be done, since Defendant Summit Oaks plainly lacked authority to treat ASAM 3.5 patients.

177. The financial pressure and job insecurity Defendant UHS placed on Relator and other managers in Relator's position would have made it impossible for Relator to maintain his position and receive financial awards and also comply with these material regulations relating to the treatment of ASAM 3.5 patients at Defendant Summit Oaks.

### 11. Defendant UHS Decides to Resist the Permedion Audit Results, While Internally Acknowledging The Accuracy of the Findings

178. But after Relator issued his May 29, 2025 memorandum to attempt to shut down the residential rehabilitation services billing fraud at Defendant Summit Oaks, Defendant UHS explored ways to continue to perpetrate the fraud, resist the Permedion audit, and fraudulently retain as much of the ill-gotten government funds as it could.

179. For instance, in an email exchange on May 30, 2025 between Relator and four high level UHS officers—(i) Craig Hilton, UHS Group Director; (ii) Michael S. McDonald, Jr., UHS Regional Vice President; (iii) Thomas Thomas, UHS Regional Director of Utilization

36

Management for the Behavioral Health Division; and (iv) Carother (Car) Evans, UHS Senior Vice President, Payer Strategies, Behavioral Health— Hilton wrote that he and Evans had discussed the Permedion audit, acknowledging that "[m]ost patients are admitted at 3.5 ASAM level."

---

From: Hilton, Craig <craig.hilton@uhsinc.com>
Sent: Friday, May 30, 2025 2:10 PM
To: Iasiello, Perry <perry.iasiello@uhsinc.com>; Leotta, Lori <Lori.Leotta@uhsinc.com>
Cc: Evans, Car <Car.Evans@uhsinc.com>; McDonald, Michael <Michael.McDonald@uhsinc.com>
Subject: Permedion denials

Lori,
I spoke with Car today regarding the Permedion denials at Summit Oaks. He suggested your team be involved and do a review of medical records that Permedion is denying. We have had one call with Permedion already for a general fact finding discussion about the denials. A second call is setup for next Tuesday to review specific cases. In summary, they are denying MCD rehab patients that do not meet ASAM level 3.7. Most patients are admitted at 3.5 ASAM level CAR suggested we have our review of the records complete and argument ready before we discuss specific cases with Permedion.

Perry – please forward to Lori or Lori's contact the cases that Permedion identified for review on the next call. We also need to notify Permedion that we will have to re-schedule the call.

Thanks.

Craig Hilton | CEO | Group Director | Craig.Hilton@UHSInc.com | Office (609) 518-2204 | Fax (609) 518-2150
Hampton Behavioral Health Center | 650 Rancocas Road, Westampton, NJ 08060 | www.hamptonhospital.com

180.    But, in that email chain, the officers at Defendant UHS then planned to look for ways to resist the Permedion audit, starting with an examination in detail of the files for four sample patients who Permedion had found Defendant Summit Oaks had improperly billed Medicaid.

181.    On June 13, 2025, high level executives of Defendant UHS held a conference call to discuss those four files and make a plan to resist the Permedion audit and continue to treat ASAM 3.5 patients.

182.    Relator attended and recorded this conference call, which included Thomas Thomas, the UHS Regional Director of Utilization Management for the Behavioral Health Division; Craig Hilton, the UHS Group Director and CEO of Defendant Hampton Hospital; Andrew Stolusky, the UHS Regional Director, Managed Care and Payer Strategies; and two employees who worked with Relator at Defendant Summit Oaks.

183.    Thomas, in particular, was on the call to review the four sample files and give his opinion on how to minimize losses, challenge the Permedion audit, and continue treating patients for substance use disorder to keep beds full at Defendant Summit Oaks by having staff at

Defendant Summit Oaks document their medical files in order to still secure Medicaid reimbursements for these patients.

184.    On that conference call, Relator explained to the supervisors from Defendant UHS that the Permedion audit had correctly found Defendant Summit Oaks could only be reimbursed for treatment of patients with "medical acuity of 3.7 hospital stay or higher" for people who "should be in a hospital," and that "any other level of care should be dealt with in community based or ambulatory level," not Defendant Summit Oaks.

185.    Thomas and Hilton both acknowledged that the Permedion audit was correct, and that Defendant Summit Oaks was not permitted for receive reimbursement for treating patients at ASAM 3.5 levels.

186.    Yet for the remainder of the call, Thomas and Hilton discussed how best to take action going forward to minimize the losses due the Permedion audit, while also still providing the residential rehabilitation services to patients going forward.

187.    First, Thomas and Hilton for Defendant UHS endorsed the plan, already being implemented, to appeal each and every finding of the Permedion audit.  Thomas acknowledged that the appeals were unlikely to succeed because the Permedion audit was correct, noting: "We can send in an appeal, but I don't know if we really have any ground to stand on with an appeal. It would just be a shot."

188.    Second, led by Thomas, the group discussed ways to have Defendant Summit Oaks' staff supplement the medical records going forward so that billing (improperly) for ASAM 3.5 patients could still potentially survive a Permedion audit.

189.    For instance, Thomas said the Permedion audit in New Jersey was similar to what was happening in other states, where the states, "especially coming out of COVID . . . were just

38

hemorrhaging money." Thomas described the audits as a way of the states were "trying to get providers in line." In light of this new focus, Thomas said: "If we want to keep these levels of care going, if we want to, you know, still keep treating these patients, our documentation is going to have to step up. At least, that's what I'm seeing."

190. Therefore, the call ended with Defendant UHS directing Defendant Summit Oaks to (i) continue to appeal every audit finding by Permedion, and (ii) educate the staff on how to better document a medical file so that Permedion will conclude that the patients receiving residential rehabilitation services were ASAM 3.7 WM or higher.

### 12.    Defendant Summit Oaks Resumes Its Improper Practices After Relator's Resignation

191. By the time Relator resigned from Defendant Summit Oaks on July 3, 2025, Defendant UHS was taking steps to continue to admit ASAM 3.5 patients and continue to fraudulently seek reimbursement from Medicaid and Medicare for those services, contrary to Relator's efforts.

192. After Relator's resignation, Relator learned that Defendant Summit Oaks, at the direction of Defendant UHS, did just this, and was still admitting ASAM 3.5 patients and fraudulently billing Medicaid and other government providers for services to them.

193. Relator learned from employees at Defendant Summit Oaks that after he left, Craig Hilton, the Group Director for Defendant UHS and the CEO of Defendant Hampton Hospital, took over for Relator as acting CEO of Defendant Summit Oaks.

194. According to these employees, Hilton told the staff at Defendant Hampton Hospital about the need to keep up revenues and fill beds at Defendant Summit Oaks. This soon translated into ignoring Relator's directive to shut down the rehabilitation services billing fraud.

39

195. Indeed, on August 15, 2025, Relator received a copy of a text exchange between two employees of Defendant Summit Oaks—Karen Stewart, the Director of Business Development, and Saadia Parvez, the Director of Admissions—showing that Defendant Summit Oaks was still engaging in its improper billing practice.

196. In the text exchange, the two employees discuss a patient who Defendant Summit Oaks had admitted that same day (August 15, 2025), after completing treatment for withdrawal management at a nearby hospital:



197. The "COWS" score of "2" referred to the "Clinical Opiate Withdrawal Scale." The COWS score falls into the following general categories: 0-4 indicates no active withdrawal, 5-12 is mild, 13-24 is moderate, 25-36 is moderately severe, and 36+ is severe withdrawal. Since a "COWS score" of "2" indicates no active opioid withdrawal, it is a condition aligning with ASAM 3.5, not ASAM 3.7 WM. As noted, Defendant Summit Oaks was only authorized to admit substance use disorder patients to ASAM 3.7 WM or higher level of care. A patient who had

40

successfully completed the detoxification process would not meet admission criteria under the Medicaid eligibility guidance.

198.    This meant that while Relator had, on May 29, 2025, sought to end the rehabilitation services billing fraud at Defendant Summit Oaks, just a few weeks after Relator left his role at Defendant Summit Oaks, Defendant Summit Oaks was back to its improper former practices, under corporate pressure from Defendant UHS to fill beds and maintain revenues.

199.    After Relator left Defendant Summit Oaks, Relator also learned about yet another example of a Medicaid patient who had completed a detoxification program on August 1, 2025, and then admitted to Defendant Summit Oaks for "inpatient rehab" services for treatment.

### 13.    Defendant UHS' Internal Documents Identify Details About and the Full Scope of the Rehabilitation services Billing Fraud

200.    Defendant UHS's own internal documents, created to track the results of the Permedion audit, identify patients who Defendant Summit Oaks improperly billed for reimbursement from Medicaid, Medicare, or other government programs, as part of the residential rehabilitation services fraudulent billing scheme.

201.    For instance, in an Excel spreadsheet titled "SOH SUD Denials as of 05-21-2025," Defendant UHS identified substance use disorder patients who had been flagged during the Permedion audit. The following is a representative sample section from that spreadsheet of patients identified, all for improper treatment and false billing following the residential rehabilitation services billing fraud:

| Patient Initials | Denied Dates | Medicaid Reimbursement | Notes |
|---|---|---|---|
| RA | 2/22/24-3/4/24 | $ 8,898.00 | Denied for rehab level of care |
| OC | 12/21/23-1/6/24 | $ 12,864.00 | Denied for rehab level of care |
| AC | 10/20/23-11/7/23 | $ 14,472.00 | Denied for rehab level of care |
| WH | 12/27/23-1/12/24 | $ 12,864.00 | Denied for rehab level of care |
| SM | 1/24/24-2/16/24 | $ 18,492.00 | Denied for rehab level of care |

41

| | | | |
|---|---|---|---|
| TB | 12/26/23-1/11/24 | $ 9,648.00 | Looks like all days were denied for detox and rehab but asking for clarification |
| MC | 1/3/24-1/11/24 | $ 6,432.00 | Denied for rehab level of care |
| AD | 12/7/23-12/14/23 | $ 5,628.00 | Denied for rehab level of care |
| JM | 12/9/23-12/15/23 | $ 4,824.00 | Denied for rehab level of care |
| BS | 12/26/23-1/24/24 | $ 23,316.00 | Denied for rehab level of care |
| JT | 1/8/24-1/19/24 | $ 8,844.00 | Denied for rehab level of care |
| AD | 1/17/24-1/25/24 | $ 2,412.00 | Denied for detox and rehab |
| TK | 10/31/24-11/10/24 | $ 8,040.00 | Denied for rehab level of care |
| RR | 8/16/23-8/23/23 | $ 4,824.00 | Denied for detox and rehab |
| BA | 3/16/24-3/22/24 | $ 4,932.00 | Denied for rehab level of care |
| WD | 1/19/24-1/30/24 | $ 8,484.00 | Denied for detox and rehab |
| AZ | 8/28/23-9/11/23 | $ 8,040.00 | Denied for detox and rehab |
| RB | 5/20/23-6/9/23 | $ 16,080.00 | Denied for rehab level of care |
| JS | 3/20-3/31/24 | $ 8,322.00 | Denied for detox and rehab level of care |
| BB | 5/7-5/15/24 | $ 6,576.00 | Denied for detox and rehab level of care |
| DB | 3/9-3/13/24 | $ 3,288.00 | Denied for rehab level of care |
| MC | 2/12-2/28/24 | $ 12,787.20 | Denied for detox and rehab level of care |
| RD | 2/9-2/28/24 | $ 14,916.00 | Denied for detox and rehab level of care |
| SE | 5/15-5/21/24 | $ 4,662.00 | Denied for detox and rehab level of care |
| DT | 2/1-2/27/24 | $ 20,904.00 | Denied for detox and rehab level of care |

202.    Another Excel spreadsheet, titled "admits 24-25," identifies "Inpatient Rehab" patients NJDOH admitted each month in 2024 and 2025. By way of example, it showed the following number of admitted patients for residential rehabilitation services for the first five months of 2024:

| Month / Year | Inpatient Rehab Admits at Defendant Summit Oaks |
|---|---|
| January 2024 | 47 |
| February 2024 | 42 |
| March 2024 | 53 |
| April 2024 | 50 |
| May 2024 | 62 |

203.    Defendant UHS, including UHS Regional Finance Director Michael Terwilliger and UHS Group Director Craig Hilton, received and reviewed these and other internal spreadsheets identifying levels of treatment for rehabilitation of these patients, and discussed the results. They were all fully knowledgeable about the fraud Defendant UHS had perpetrated.

42

204.    As for the full scope of the fraud, internal financial records that Relator sent to Defendant UHS identified, among other lines of data, the amount of revenues that Defendant Summit Oaks received specifically from "adult rehab" services at Defendant Summit Oaks, which included revenue from the Federal Government and the State of New Jersey.

205.    For the 2024 year end report for the period ending December 31, 2024, the annual revenue for adult residential rehabilitation services was $13,265,500. Relator estimates that at least 75% of the revenue was from Medicaid, Medicare or other similar government programs, and that the fraud continued for at least six years prior to the filing of this Complaint.

206.    Assuming a 25% reduction for private insurance or private pay patients, and steady rates of billing over a six year period, this means total reimbursements from Medicaid, Medicare or other government providers is approximately $59.7 million.

**B.    THE IOP/PHP FRAUD**

207.    After Relator began working at Defendant Summit Oaks in May 2024, Relator discovered another fraudulent billing practice, this one occurring at both Defendant Summit Oaks and Defendant Hampton Hospital, again with the full knowledge, approval and direction of Defendant UHS.

**1.    IOP vs. PHP**

208.    The fraud Relator observed involved the difference between *"Intensive Outpatient Programs,"* known as *"IOPs,"* and *"Partial Hospitalization Programs,"* known as *"PHPs."*

209.    IOPs and PHPs are both structured outpatient mental health or substance abuse treatment options, with certain key differences in terms of intensity, duration, and popularity—as well as Medicaid and Medicare reimbursements rates.

43

210.    IOPs are less intensive, involving 3-4 hours of treatment per day, 3-4 days per week. IOPs focus on group therapy, individual counseling, education about mental health or addiction, and skill-building.

211.    In contrast, PHPs are more intensive and typically require 4-6 hours of treatment per day, 5-7 days per week. PHP patients receive comprehensive care that may include individual therapy, group therapy, medication management, psychiatric services, and specialized treatments.

212.    Therefore, as compared to IOPs, PHPs require more hours per day and days per week, and a higher level of medical supervision. IOPs—the more common of the two treatments—target patients who can maintain their daily responsibilities like work or school while receiving treatment, or as a step-down from PHP or inpatient care.

### 2.    Defendants Solicited Patients for IOP Services They Were Not Licensed to Perform

213.    Defendants Summit Oaks and Hampton Hospital were each licensed by NJDOH pursuant to N.J.A.C. § 10:52-1.3 to provide outpatient hospital services, and N.J.A.C. § 10:52-1.17 to provide outpatient psychiatric services.

214.    Neither of these regulations permitted either Defendant Summit Oaks or Defendant Hampton Hospital to provide IOP services.

215.    Yet, when Relator began working for Defendant Summit Oaks in May 2024, Relator found that Defendants Summit Oaks and Hampton Hospital both (i) actively solicited patients to provide IOP services to patients, and (ii) purported to provide IOP services to patients, even though they were not licensed to provide those services. Further, Defendants Summit Oaks and Hampton Hospital, with the knowledge and at the direction of Defendant UHS, both also billed Medicaid, Medicare and other government providers by claiming they had provided the higher level, and more expensive, PHP services.

44

216.    Relator observed that Defendant Summit Oaks' website in 2024 advertised the IOP services that Defendant Summit Oaks was not permitted to perform.

217.    As of at least August 2024, Defendant Summit Oaks' website[3] included an entire section, "Adult Intensive Outpatient Program (IOP)," advertising a service that the NJDOH had not licensed Defendant Summit Oaks to perform:



218.    The problem was, Defendant Summit Oaks was never licensed or otherwise authorized to provide the IOP services it advertised on its website.

219.    Similarly, Defendant Hampton Hospital also promoted on its website IOP services that Defendant Hampton Hospital was never licensed to perform. The following is from the current website for Defendant Hampton Hospital as of the filing of this Complaint:[4]

---

[3] https://web.archive.org/web/20240822090636/https://summitoakshospital.com/programs-services/adult-outpatient-programs/intensive-outpatient-program-iop/
[4] https://hamptonhospital.com/treatment-and-services/outpatient-services/intensive-outpatient-iop/



220.    In addition to leading to false reimbursements claims to Medicaid and Medicare and other government programs, as set forth in this Complaint, these websites also constitute false or misleading advertising in connection with the advertisement of addiction treatment services. On August 11, 2025, the State of New Jersey enacted legislation specifically addressing acts of this type, "protecting individuals seeking addiction treatment from being misled, exploited, or referred for profit," according to the Governor's press release.  The two new statutes signed into law "strengthen accountability within the substance use treatment industry, supporting patients in making informed choices and ensuring that care decisions are driven by clinical need rather than financial gain."[5]

---

[5] https://www.nj.gov/governor/news/news/562025/approved/20250811b.shtml

46

**3.    Providing IOP Services but Upcoding to PHP Levels**

221.    Relator found that Defendants Summit Oaks and Hampton Hospital were both (i) performing IOP services for clients, for which neither Defendant Summit Oaks nor Defendant Hampton Hospital were licensed to perform, and (ii) submitting false claims to Medicaid, Medicare and other government programs by falsely upcoding to claim they were performing the higher PHP level of care, not IOP level of care.

222.    For example, neither Defendant Summit Oaks nor Defendant Hampton Hospital complied with any of the following NJDOH regulations, which they would have been required to comply with in order to properly provide IOP services to patients:

    a.    N.J.A.C. § 10:161B-2.1(a) ("All facilities operating as outpatient substance use disorder treatment facilities shall be licensed by OOL [the Office of Licensing within the Department of Human Services Office of Program Integrity and Accountability- in accordance with this chapter. No facility shall operate an outpatient substance use disorder treatment facility until OOL issues a license to do so.");

    b.    N.J.A.C. § 10:161B-2.1(j) ("None of the following category designations of services shall be provided by an outpatient substance use disorder treatment facility unless the license application indicates that the service is to be provided by the program: partial care; intensive outpatient; outpatient; outpatient detoxification; or opioid treatment which may include opioid detoxification as well as opioid maintenance.");

47

c. N.J.A.C. § 10:161B-2.3(b) ("No facility or program shall admit clients until the facility or program has a license by OOL to operate the specific modality or modalities of treatment as referenced in N.J.A.C. 10:161B-2.1(j).");

d. N.J.A.C. § 10:161B-3.12 ("The smoking of tobacco products and the use of spit or any form of tobacco is prohibited within all outpatient substance use disorder treatment facilities."); and

e. N.J.A.C. § 10:161B-10.3(a) ("Every program shall provide or coordinate the following services for each client as appropriate to the client's treatment plan: (1) Vocational and educational counseling and training; (2) Job placement for clients whose plans of care indicate a need for such services; and (3) Referral to legal services rendered by an attorney, licensed or otherwise authorized to practice law in New Jersey, when such services are related to the client's treatment.").

223.    By claiming to perform IOP level of services but upcoding to PHP level of care, Defendants were masking the fact that they were performing services for which they were not licensed to perform.

224.    Further, Defendants were collecting funds from Medicaid, Medicare and other government programs for PHP services they were not actually performing.

### 4.    Relator Learns About the Practices and Puts a Stop to It at Defendant Summit Oaks, But not Defendant Hampton Hospital

225.    After Relator found out about the improper practices in about November 2024, Relator put an end to it.

226.    Relator ordered the cessation of IOP services at Defendant Summit Oaks, and ensured that PHP services that were billed were for actual PHP services, not IOP services.

48

227. Relator also changed the Defendant Summit Oaks website to remove the section advertising IOP services.

228. But because Relator did not oversee or control operations at Defendant Hampton Hospital, he did not have authority to take action there. Yet, Defendant UHS was well aware of the problem, because Relator explained to his supervisors at Defendant UHS why he was making the change at Defendant Summit Oaks.

229. Relator observed that even as Defendant Summit Oaks shut down its unlicensed provision of services and fraudulent billing practices, that Defendant Hampton Hospital continued on as "business as usual."

### 5.    Scope of the IOP Fraud

230. Based on Relator's review of the files, Defendant Summit Oaks received millions of dollars in reimbursements from Medicaid and other government programs.

231. By way of example, Relator received an Excel spreadsheet, titled "AllPaymentsbyPostingDateRange-IOP CD," which listed IOP reimbursements by month at Defendant Summit Oaks. (The "CD" in the file name stands for "chemical dependency.")

232. Defendant Summit Oaks used the Service Code "NCL" internally in its records to show when IOP-level of service was provided to patients. But when it came to reimbursement claims for Medicaid, Medicare, or other government providers, Defendant Summit Oaks falsely claimed the higher PHP-level of care, since that is all Defendant Summit Oaks was authorized to provide and seek reimbursement for.

233. This was upcoding, since the Defendants were billing Medicaid and other government providers for a higher, and more expensive, level of service than what the Defendants were actually providing.

49

234. The following is representative example of information from that Excel file about specific patients who, in January 2024, Defendant Summit Oaks falsely billed Medicaid or Medicare for based on the IOP fraud:

| Posting Date | Patient Initials | Age | Service Code | Admit Date | Carrier Name | Discharge Date | Payment Amount |
|---|---|---|---|---|---|---|---|
| 1/16/2024 | DP | 42 | NCL | 12/1/2023 | MEDICAID | 12/31/2023 | $358.02 |
| 1/22/2024 | DR | 45 | NCL | 12/1/2023 | MEDICAID | 12/31/2023 | $477.36 |
| 1/22/2024 | EB | 43 | NCL | 12/1/2023 | MEDICAID | 12/31/2023 | $298.35 |
| 1/19/2024 | PR | 70 | NCL | 11/13/2023 | MEDICARE OUTPATIENT | 11/30/2023 | $226.94 |
| 1/24/2024 | PR | 70 | NCL | 12/1/2023 | MEDICARE OUTPATIENT | 12/31/2023 | $1,143.72 |
| 1/23/2024 | CS | 75 | NCL | 11/20/2023 | MEDICARE OUTPATIENT | 11/30/2023 | $97.26 |
| 1/24/2024 | CS | 75 | NCL | 12/1/2023 | MEDICARE OUTPATIENT | 12/31/2023 | $127.08 |
| 1/24/2024 | JO | 65 | NCL | 12/4/2023 | MEDICARE OUTPATIENT | 12/31/2023 | $1,397.88 |
| 1/31/2024 | JO | 65 | NCL | 12/4/2023 | MEDICARE OUTPATIENT | 12/31/2023 | $356.62 |

235. The following is another representative example of information from that Excel file about specific patients who, in May 2024, Defendant Summit Oaks falsely billed Medicaid or Medicare for based on the IOP fraud:

| Posting Date | Patient Initials | Age | Service Code | Admit Date | Carrier Name | Discharge Date | Payment Amount |
|---|---|---|---|---|---|---|---|
| 5/23/2024 | PR | 70 | NCL | 12/1/2023 | MEDICARE OUTPATIENT | 12/31/2023 | $264.85 |
| 5/23/2024 | PR | 70 | NCL | 12/1/2023 | MEDICARE OUTPATIENT | 12/31/2023 | $878.87 |
| 5/23/2024 | PR | 70 | NCL | 12/1/2023 | MEDICARE OUTPATIENT | 12/31/2023 | $1,143.72 |
| 5/24/2024 | PR | 70 | NCL | 1/1/2024 | MEDICARE OUTPATIENT | 1/31/2024 | $637.23 |
| 5/16/2024 | PR | 70 | NCL | 2/1/2024 | MEDICARE OUTPATIENT | 2/29/2024 | $579.30 |
| 5/22/2024 | PR | 70 | NCL | 3/1/2024 | MEDICARE OUTPATIENT | 3/31/2024 | $521.37 |
| 5/28/2024 | PR | 70 | NCL | 4/1/2024 | MEDICARE OUTPATIENT | 4/30/2024 | $2,041.11 |
| 5/23/2024 | JO | 65 | NCL | 12/4/2023 | MEDICARE OUTPATIENT | 12/31/2023 | $1,397.88 |
| 5/23/2024 | JO | 65 | NCL | 4/1/2024 | MEDICARE OUTPATIENT | 4/17/2024 | $907.16 |
| 5/20/2024 | KC | 56 | NCL | 4/1/2024 | MEDICAID | 4/30/2024 | $716.04 |

50

| 5/20/2024 | SG | 51 | NCL | 4/1/2024 | MEDICAID | 4/30/2024 | $656.37 |
|---|---|---|---|---|---|---|---|

236. Internal corporate records also identify the IOP fraud and its scope over the years. An Excel file titled "Admits 19-2025" identifies the number of patients each month from January 2019 until June 2025 admitted at Defendant Summit Oaks for IOP, PHP, and other categories. For IOP, the chart shows it is 1,814 patients in all.

237. Since Defendant Summit Oaks was not licensed to treat IOP patients at all, this spreadsheet therefore identifies 1,814 patients that Defendant Summit Oaks improperly treated. For each of those patients who was on Medicaid or another government program (the majority of the patients were), this meant Defendant Summit Oaks was falsely billing those government programs, including by upcoding to PHP level of services.

238. For the 2024 year end report for the period ending December 31, 2024 for Defendant Summit Oaks, the annual revenue for adult IOP services was $1,127,530. Assuming 75% of those patients were covered by Medicaid, Medicare or other government programs, and that the same general level of patient volume occurred throughout the six year period, then the full revenue from government programs for the improper IOP services was approximately $5.07 million for Defendant Summit Oaks.

239. Relator observed that Defendant Hampton Hospital had similar volume of improper billing activity. Therefore, doubling the estimated revenues from government providers for the improper IOP billing, to capture both facilities across the six year period, yields approximately $10.14 million.

C.    **RELATOR IS CONSTRUCTIVELY DISCHARGED FROM DEFENDANT SUMMIT OAKS**

240. While Relator formally resigned from his position on July 3, 2025, Relator was, in fact, constructively discharged and forced into the resignation.

51

241.    First, as set forth herein, Relator had identified the fraudulent schemes to Defendants, and refused to participate in the schemes.  Yet Defendants continued the fraudulent schemes and required Relator's support for the fraudulent schemes.

242.    Second, after Relator began working at Defendant Summit Oaks in May 2024, Defendant UHS directed Relator to sign an "Annual Management Certification."  Hilton, the Group Director at Defendant UHS and Relator's most immediate supervisor, told Relator that the Annual Management Certification was an annual requirement of his position, and something needed for the Corporate Integrity Agreement that Defendant UHS was subject to based on a past False Claims Act case and settlement.[6]

243.    On about July 6, 2024, Relator signed his first (and only) Annual Management Certification, certifying that Defendant Summit Oaks was in compliance with all material laws and regulations:

### Annual Management Certification

I, Perry Iasiello, served as the Chief Executive Officer of Summit Oaks Hospital during the period March 4, 2024, to July 5, 2024.  I submit this Certification for the period I served as the CEO during the Fourth Reporting Period, defined as July 6, 2023, through and including July 5, 2024.

I have been trained on and understand the compliance requirements and responsibilities as they relate to areas under my supervision.  My job responsibilities include ensuring compliance regarding such operations with all applicable Federal health care program requirements, obligations of the Corporate Integrity Agreement, and UHS policies and I have taken steps to promote such compliance.  To the best of my knowledge, the operations under my supervision are in compliance with all applicable Federal health care program requirements and the obligations of the Corporate Integrity Agreement.  I understand that this certification is being provided to and relied upon by the United States.

(highlight added).

244.    At the time Relator signed the Annual Management Certification in July 2024, Relator was unaware of the false billing practices described in this Complaint.

---

[6] https://www.justice.gov/archives/opa/pr/universal-health-services-inc-and-related-entities-pay-122-million-settle-false-claims-act

52

245.    However, by Spring of 2025, Relator had become aware of the numerous false billing practices by the Defendants as set forth herein.  Relator had also communicated with Defendant UHS about these billing fraud issues and had seen that Defendant UHS was not permitting Defendant Summit Oaks to come into compliance with the relevant laws and regulations.

246.    Yet Defendant UHS still directed Relator to sign a new Annual Management Certification in July 2025 as part of his job requirements.

247.    By June 2025, Relator knew he would not be able to certify to the statement, "To the best of my knowledge, the operations under my supervision are in compliance with all applicable Federal health care program requirements and the obligations of the Corporate Integrity Agreement."

248.    Relator had also attempted to get Defendant UHS to come into compliance with applicable Federal health care program requirements, to no avail.

249.    Relator had identified the fraudulent schemes to Defendants, and refused to participate in the fraudulent schemes.  Yet the Defendants continued the fraudulent schemes, and required Relator support the fraudulent schemes.  This made the working conditions so intolerable for Relator that any reasonable employee would have been forced to resign under the same circumstances.

250.    Seeing no other choice between his continued employment and participating in fraudulent schemes, including by signing a false certification, Relator resigned on July 3, 2025.

251.    Relator was therefore constructively discharged because of lawful acts he had undertook to identify Defendant Summit Oaks' violations of material laws and regulations, in violation of the FCA and NJFCA.  Relator engaged in protected conduct by identifying to the

53

Defendants their violations of material laws and regulations, including violations of the FCA and NJFCA. Relator was then retaliated against and constructively discharged because of his protected conduct.

## VIII.  CAUSES OF ACTION

### COUNT I
### FALSE CLAIMS ACT VIOLATIONS:
### PRESENTATION OF FALSE CLAIMS
### 31 U.S.C. § 3729(a)(1)(A)
### *(All Defendants)*

252.    Relator repeats the allegations contained in the above paragraphs as if fully set forth herein.

253.    By virtue of the acts alleged herein, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

254.    The Federal Government paid the false and/or fraudulent claims.

255.    By virtue of the false or fraudulent claims that Defendants knowingly presented or caused to be presented, the Federal Government has suffered substantial monetary damages.

256.    As a result of Defendants acts, the Federal Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the Federal Government is entitled to treble damages and penalties for each and every violation of 31 U.S.C. § 3729(a) arising from Defendants' unlawful conduct as described herein.

<u>**COUNT II**</u>
**FALSE CLAIMS ACT VIOLATIONS:**
**FALSE RECORDS OR STATEMENTS**
**31 U.S.C. § 3729(a)(1)(B)**
*(All Defendants)*

257.    Relator repeats the allegations contained in the above paragraphs as if fully set forth herein.

258.    By virtue of the acts alleged herein, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

259.    Defendants' false claims or statements include, but are not limited to, false invoices and reimbursement claims containing tainted claims for reimbursement.

260.    By submitting claims for payment and retaining improperly obtained payments, Defendants expressly and impliedly, if falsely, certified to their accuracy.

261.    Defendants knowingly made or used, or caused to be made or used, false records or statements, and omitted material facts (a) to get false or fraudulent claims paid or approved by the Federal Government, or (b) that were material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a).   Each false claim for payment represents a false or fraudulent record or statement. And each claim for payment submitted to a federal health insurance program represents a false and/or fraudulent claim for payment.

262.    By virtue of the false records or statements that Defendants made or used, the Federal Government has suffered substantial monetary damages.

263.    As a result of Defendants' acts, the Federal Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the Federal Government is entitled to treble damages and penalties for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

55

## COUNT III
## FALSE CLAIMS ACT VIOLATIONS:
## REVERSE FALSE CLAIMS
## 31 U.S.C. § 3729(a)(1)(G)
### *(All Defendants)*

264.    Relator repeats the allegations contained in the above paragraphs as if fully set forth herein.

265.    Defendants had a duty under federal law to return excess payments to the federal government and the State of New Jersey.

266.    A defendant that "knowingly conceals or knowingly and improperly avoids or decreases an obligation" to return funds to the federal government is liable under the False Claims Act. 31 U.S.C. §3729(a)(1)(G).

267.    Defendants made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government.

268.    By reason of Defendants' knowing and improper retention of the overpayments described herein, the Federal Government has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

269.    By reason of the acts and conduct of Defendants in violation of 31 U.S.C. §3729(a)(1)(G), the Federal Government has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the Federal Government is entitled to recover civil money penalties, and other monetary and non-monetary relief as deemed appropriate.

## COUNT IV
## FALSE CLAIMS ACT VIOLATIONS:
## CONSPIRING TO SUBMIT A FALSE CLAIM
## 31 U.S.C. §3729(A)(1)(C)
### *(All Defendants)*

270.    Relator repeats the allegations contained in the above paragraphs as if fully set forth herein.

271.    The FCA makes it a violation under 31 U.S.C. §3729(a)(1)(C) to "conspire[] to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."

272.    As described above, Defendants conspired to commit a violation of 31 U.S.C. §3729(a)(1)(A), (B), and (G).

273.    Defendants' conduct satisfies the elements of a conspiracy sufficient to result in FCA liability, as: (1) an agreement existed among the Defendants to have false or fraudulent claims allowed or paid to the government; (2) the Defendants each joined that agreement; and (3) one or more of the Defendants knowingly committed one or more overt acts in furtherance of the object of the conspiracy.

274.    By reason of the acts and conduct of Defendants in violation of 31 U.S.C. §3729(a)(1)(C), the Federal Government has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the Federal Government is entitled to recover treble damages and penalties for each and every violation of 31 U.S.C. §3729(a)(1)(C), and other monetary and non-monetary relief as deemed appropriate.

57

## COUNT V
## NEW JERSEY FALSE CLAIMS ACT VIOLATIONS
### N.J.S.A. § 2A:32C-1 *et seq.*
### *(All Defendants)*

275.    Relator repeats the allegations contained in the above paragraphs as if fully set forth herein.

276.    As a result of the conduct described in these allegations, Defendants have violated sections (a), (b), (c), and(g) of N.J.S.A. § 2A:32C-3, defining liability under the NJFCA.

277.    During the relevant time, Defendants have (1) knowingly presented or caused to be presented to the State of New Jersey a false or fraudulent claim for payment or approval, as contemplated by N.J.S.A. § 2A:32C-3(a); (2) knowingly made, used or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State of New Jersey, as contemplated by N.J.S.A. § 2A:32C-3(b); (3) conspired to defraud the State of New Jersey by getting a false or fraudulent claim allowed or paid by the State of New Jersey, as contemplated by N.J.S.A. § 2A:32C-3(c); and (4) knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state, as contemplated by N.J.S.A. § 2A:32C-3(g).

278.    Specifically, Defendants submitted or caused to be submitted reimbursement claims containing false and fraudulent claims for payment and approval by New Jersey Medicaid or other state-sponsored health care providers knowing the claims were not entitled to such payment or approval, and improperly retained payments that they knew were required to be refunded to the State of New Jersey programs.

279.    As a result of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the State of New

58

Jersey is entitled to penalties for each false or fraudulent claim, plus three times the amount of damages which the State sustains arising from Defendants' unlawful conduct as described herein.

## COUNT VI
### RETALIATORY DISCHARGE, FALSE CLAIMS ACT
### 31 U.S.C. § 3730(h)
### *(Defendants UHS, Inc., UHS Delaware and Summit Oaks)*

280.    Relator repeats the allegations contained in the above paragraphs as if fully set forth herein.

281.    Pursuant to 31 U.S.C. § 3730(h), the FCA prohibits an employer from discharging, constructively discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee in the terms and conditions of employment because of lawful acts done by the employee in furtherance of an action under the FCA.

282.    As detailed above, Relator had identified the fraudulent schemes set forth in this Complaint to Defendants, and refused to participate in the fraudulent schemes.  Yet the Defendants continued the fraudulent schemes, and required Relator to support the fraudulent schemes.

283.    This made the working conditions so intolerable for Relator that any reasonable employee would have been forced to resign under the same circumstances.

284.    Seeing no other choice between his continued employment and participating in fraudulent schemes, including by signing a false certification, Relator resigned on July 3, 2025.

285.    Under these circumstances, Defendants UHS, Inc., UHS Delaware and Summit Oaks constructively terminated Relator because Relator lawfully reported what he reasonably believed to be fraudulent conduct or wrongdoing, in violation of the FCA, and these Defendants placed intolerable conditions for Relator to continue his employment.

286.    The conduct of Defendants UHS, Inc., UHS Delaware and Summit Oaks was in violation of 31 U.S.C. § 3730(h).

59

287.    As a direct result of these violations by Defendants UHS, Inc., UHS Delaware and Summit Oaks, Relator has suffered injury, among other things in the form of lost compensation and benefits, and non-economic damages for emotional distress and other pain and suffering. Relator seeks compensatory damages and other appropriate statutory relief.

## COUNT VII
## RETALIATORY DISCHARGE, NEW JERSEY FALSE CLAIMS ACT
## N.J.S.A. § 2A:32C-10(b)
### *(Defendants UHS, Inc., UHS Delaware and Summit Oaks)*

288.    Relator repeats the allegations contained in the above paragraphs as if fully set forth herein.

289.    Pursuant to N.J.S.A. § 2A:32C-10(b), the NJFCA prohibits an employer from discharging, constructively discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee in the terms and conditions of employment because of lawful acts done by the employee in furtherance of an action under the NJFCA.

290.    As detailed above, Relator had identified the fraudulent schemes set forth in this Complaint to Defendants, and refused to participate in the fraudulent schemes. Yet the Defendants continued the fraudulent schemes, and required Relator to support the fraudulent schemes. This made the working conditions so intolerable for Relator that any reasonable employee would have been forced to resign under the same circumstances.

291.    Seeing no other choice between his continued employment and participating in fraudulent schemes, including by signing a false certification, Relator resigned on July 3, 2025.

292.    Under these circumstances, Defendants UHS, Inc., UHS Delaware and Summit Oaks constructively terminated Relator because Relator lawfully reported what he reasonably believed to be fraudulent conduct or wrongdoing, in violation of the NJFCA, and Defendants UHS,

60

Inc., UHS Delaware and Summit Oaks placed intolerable conditions for Relator to continue his employment while allowing that fraud on the State of New Jersey to continue.

293.   Defendant UHS' conduct was in violation of N.J.S.A. § 2A:32C-10(b).

294.   As a direct result of Defendant UHS' violations, Relator has suffered injury, among other things in the form of lost compensation and benefits, and non-economic damages for emotional distress and other pain and suffering.  Relator seeks compensatory damages and other appropriate statutory relief.

## COUNT VIII
### NEW JERSEY CONSCIENTIOUS EMPLOYEE PROTECTION ACT
### N.J.S.A. § 34:19-1 *et seq.*
### *(Defendants UHS, Inc., UHS Delaware and Summit Oaks)*

295.   Relator repeats the allegations contained in the above paragraphs as if fully set forth herein.

296.   At all times relevant to this action, Defendants UHS, Inc., UHS Delaware and Summit Oaks were each an employer as that term is defined in N.J.S.A. 34:19-2(a).

297.   At all times relevant to this action, Relator was an employee of each of Defendants UHS, Inc., UHS Delaware and Summit Oaks, as that term is defined in N.J.S.A. 34:19-2(b).

298.   During the course of Relator's employment, Relator objected to activities and practices of Defendants, that Relator reasonably believed were fraudulent, in violation of public policy, and/or in violation of federal law.

299.   As a direct result of this, Defendants took retaliatory action against, and constructively discharged, Relator.

300.   Defendants are liable to Relator for unlawful retaliation and constructive discharge in violation of CEPA pursuant to N.J.S.A. 34:19-1 *et seq.*

301.   Relator seeks compensatory damages and other appropriate statutory relief.

61

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff-Relator prays for entry of judgment against each of the Defendants as follows:

A.     That Defendants each be ordered to cease and desist from further violation of the FCA and the NJFCA;

B.     That Defendants pay three times the amount of damages the United States and State of New Jersey has each sustained because of Defendants' actions for each violation of the FCA and NJFCA;

C.     That Defendants pay not less than $14,308 to $28,619, as adjusted for inflation, for each false statement and violation of the FCA and NJFCA, that the United States and State of New Jersey has each sustained because of Defendants' actions;

D.     That Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs, in accord with 31 U.S.C. § 3730(d) and N.J.S.A. § 2A:32C-8, and any other applicable provision of the law;

E.     That Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and N.J.S.A. § 2A:32C-7;

F.     That, pursuant to 31 U.S.C. § 3730(h) and N.J.S.A. § 2A:32C-10(c), Relator be awarded two times lost pay and special damages flowing from the retaliation and forced resignation set forth in this Complaint;

G.     That, pursuant to 31 U.S.C. § 3730(h), N.J.S.A. § 2A:32C-10(c), and N.J.S.A. § 34:19-1 *et seq.*, Relator be awarded all applicable damages relating to his wrongful constructive termination in an amount to be determined at trial, plus prejudgment interest, to compensate Relator for all monetary and/or economic damages, including, but not limited to, the loss of past

62

and future income, wages, compensation, job security and other benefits of employment, as well as special damages and damages for any and all other monetary and/or non-monetary losses suffered by Relator in an amount to be determined at trial;

H.     That the United States, State of New Jersey, and the Relator be awarded prejudgment and post judgment interest;

I.     That Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the court;

J.     That Defendants be excluded from future participation in government programs; and

K.     For such further relief as the Court deems appropriate.

## LOCAL CIVIL RULE 11.2 CERTIFICATION

I hereby certify that to the best of my knowledge the matter in controversy is not the subject of any other pending action, arbitration, or administrative proceeding. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator demands a trial by jury of all issues so triable.

Respectfully submitted this 11th day of September, 2025.

By:_____
Robert A. Magnanini
Kenneth S. Levine
Julio C. Gomez
STONE & MAGNANINI LLP
400 Connell Drive, Suite 6200
Berkeley Heights, NJ 07922
Tel:   (973) 218-1111
Fax:   (973) 218-1106
rmagnanini@smcomplex.com
klevine@smcomplex.com
jgomez@smcomplex.com

*Attorneys for Relator Perry Iasiello*

64